# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville January 25, 2011

## MARILYN DENISE AVINGER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-B-1239     Steve R. Dozier, Judge**

_____

**No. M2009-02577-CCA-R3-PC - Filed May 3, 2011**

_____

The Petitioner, Marilyn Denise Avinger, appeals the Davidson County Criminal Court's denial of post-conviction relief from her conviction of attempted second degree murder, for which she received a nine-year sentence, with all but thirty days to be served on probation. On appeal, she contends that trial counsel rendered ineffective assistance. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Ashley Preston, Nashville, Tennessee, for the appellant, Marilyn Denise Avinger.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sombrero, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The facts of the Petitioner's conviction were stated by this court on direct appeal:

> The victim, Sadie Mae Brooks, testified that she lived with the defendant's mother at her home in Nashville when she was attacked by the defendant. The victim stated that the defendant did not live in the home. The victim testified that on the day of the attack, the defendant entered her room about fifteen minutes after the victim returned home from work. The defendant accused the victim of cheating on her brother, Charles

Avinger. The defendant confronted the victim about staying in a hotel room with the defendant's boyfriend. According to the victim, the defendant then jumped on top of her and began hitting and scratching her. The victim scratched the defendant and pulled her hair to get the defendant to stop. The defendant cried out for her mother at one point before ending her initial attack.

The victim testified that after the defendant ceased her initial attack, she left the room and went into the kitchen. The victim walked to the doorway of her bedroom and saw the defendant grab a knife from the kitchen counter. According to the victim, the defendant charged at her with the knife yelling, "Bitch, I'm going to kill you." The victim attempted to shut the door but the defendant blocked the door with her foot. The defendant reached around the door with the knife and began stabbing repeatedly at the victim. The defendant succeeded in stabbing the victim on the left hand and wrist. The victim recalled that after the defendant stabbed her hand, she bled profusely and believed that she was going to pass out. According to the victim, the defendant also succeeded in stabbing her in the shoulders, once above the right breast, and once on the left arm.

The victim testified that she was finally able to get the door closed and locked. She dialed 9-1-1 on the telephone in the bedroom. The cord for the phone went to a jack on the other side of the door. The defendant unplugged the phone before the victim could complete her call. The victim stated that she waited in the room until the police and paramedics arrived and transported her to the hospital. She testified that months after the attack, she still had scars from the stabbing. She also suffered a permanent injury to her finger which prevented her from moving it.

On cross-examination, the victim testified that she had lived at the defendant's mother's home for about six to seven months prior to the attack and had been dating the defendant's brother for about nine months. She stated that prior to living with the defendant's mother, she had been homeless. After

2

getting a job, she was able to pay the defendant's mother rent and pay for food. The victim stated that she had been the defendant's friend until the defendant got a new boyfriend. She stated that after the defendant attacked her, she moved in with a family member before moving back to her hometown.

On cross-examination, the victim testified that she was sitting on her bed and working on paying her bills when the defendant confronted her. According to the victim, the defendant jumped on her as she sat on the bed. The victim stated that the defendant's mother and the defendant's brother were in the living room adjacent to the victim's bedroom. She stated that neither the defendant's mother nor the defendant's brother came into the room during the attack.

The victim further testified that after the incident, the defendant's brother placed the knife the defendant used in the kitchen sink. According to the victim, the defendant's brother did not call 9-1-1 for her. She stated that from the time she dialed 9-1-1, it was approximately ten minutes before police and paramedics arrived at the house. She stated that she was taken to the emergency room and given stitches. The victim stated that after she left the house, the defendant's brother called her and asked her to drop the charges against his sister. The victim refused his request.

Charles Avinger testified that he was the defendant's brother and was dating the victim at the time. He stated that as he was returning to his mother's house, he encountered his sister, the defendant, leaving the house to go to work. The defendant informed him that the victim was having a relationship with her boyfriend. Mr. Avinger entered the house and saw the victim who was bleeding and had a towel wrapped around her arm. His mother yelled at him to call the police. According to Mr. Avinger, he dialed 9-1-1 before asking the victim what happened.

Mr. Avinger testified that he never saw the fight between the victim and the defendant. He stated that he never touched the knife used in the attack. Mr. Avinger admitted that he and

3

his mother had consumed about four or five beers during the course of the day but maintained that he was not drunk. After paramedics arrived and took the victim to the hospital, he remained at the house with his mother. Mr. Avinger noted that there was quite a bit of blood on the door to the victim's bedroom, as well as on the rug and on clothes left on the bedroom floor.

On cross-examination, Mr. Avinger testified that when he encountered his sister outside the house, she was walking, not running. He noticed that she had scratches and her shirt was torn and had blood on it. Mr. Avinger identified a photograph of the maroon rug and the carpet underneath it from the floor of the bedroom he shared with the victim. He stated that the maroon rug and the carpet had brown stains on them prior to the attack. However, he admitted that there was blood all over the rug and the carpet after the attack. He acknowledged that the rug and carpet did not have any blood on them when he left the house earlier that day.

The defendant testified that she went to the house shared by the victim, her brother and her mother after work to check on her mother. When she arrived at the house, the first person she saw was the victim. She told the victim that she knew that her boyfriend and the victim had engaged in a sexual relationship behind her back. She informed the victim that she had a bank statement proving that her boyfriend and the victim had been together in a hotel. The defendant stated that she was upset because she had allowed the victim access to her house, and she believed that the victim had been sleeping with her boyfriend while the defendant was at work.

The defendant testified that she told the victim that she was going to tell her brother about the victim's relationship with the defendant's boyfriend. According to the defendant, the victim jumped up from where she was sitting on the bed and the two began to fight. The two scratched and pulled each other's hair as they fell onto the bed and rolled around, fighting. According to the defendant "from somewhere-I don't know where-a knife come up." The two women struggled over the

4

knife. At one point, the knife penetrated the victim's hand. The defendant stated that she did not have a knife that day when she went over to the house. She denied ever going to the kitchen to retrieve a knife.

The defendant testified that the victim tore a large clump of hair from her head and was pulling on her hair when the defendant called out to her mother to tell the victim to release her. According to the defendant, her mother came in and told the two women to quit fighting. The defendant heard her mother run out of the room and yell for her brother. The defendant identified a photograph taken of her after the incident and pointed out injuries and scars she received as a result of her struggle with the victim.

On cross-examination, the defendant testified that the knife that was used in the fight was no bigger than a steak knife or a paring knife. She stated that as she left the house and encountered her brother, she told him "he was right." According to the defendant, this comment was related to a message Mr. Avinger left the defendant on her answering machine about his suspicion that the defendant's boyfriend and the victim were having a relationship. The defendant admitted that when she came to her mother's house, she brought her boyfriend's bank statement with her in order to confront the victim.

The defendant further testified that she did not know how the victim came to be stabbed in each shoulder during the struggle on the bed. The defendant admitted that she only called out to her mother to get the victim to stop pulling her hair. She also admitted that she did not call out to her mother during the time the victim had the knife, or at any point during the fight when the victim was stabbed. The defendant stated that all of the cutting occurred while the two women were "tussling" on the bed. The defendant admitted that she left her mother alone in the house with the victim and the knife when she left. She also admitted that she did not warn her brother about the victim before he entered the house.

The jury found the defendant guilty of attempted second-degree murder.

State v. Marilyn Denise Avinger, No. M2007-00706-CCA-R3-CD, Davidson County (Tenn. Crim. App. Sept. 4, 2008), app. denied (Tenn. Mar. 2, 2009). On direct appeal, this court affirmed the conviction, holding that the evidence was sufficient to support the conviction and that the trial court did not err by admitting a photograph of blood in the bedroom where the attack took place to rebut the testimony of a defense witness. Id.

Seven days after the supreme court denied the Petitioner's application for discretionary appeal, she filed a pro se post-conviction petition alleging that the attorney who represented her at trial and the attorney who represented her in the sentencing hearing and on direct appeal rendered ineffective assistance of counsel. Counsel was appointed and filed an amended petition. The amended petition alleged that trial counsel and appellate counsel failed to file motions and request hearings in order to preserve issues for the appeal; that trial counsel failed to investigate the case and use investigative services; that trial counsel and appellate counsel failed to communicate with the Petitioner; that trial counsel did not adequately advise the Petitioner about the defense strategy; that trial counsel failed to consult with the Petitioner during hearings and the trial; that trial counsel performed deficiently at the trial in cross-examination, direct examination of the Petitioner, and failing to raise objections; that trial counsel failed to present favorable evidence; that trial counsel opened the door for prejudicial impeachment evidence through cross-examination of a witness; that trial counsel failed to give an effective closing argument; and that appellate counsel failed to raise all of the issues in the motion for new trial.

At the post-conviction hearing, the Petitioner testified that she could not afford to retain the attorney who represented her at the preliminary hearing for her trial and that trial counsel was appointed after she was released on bond. She said she met with trial counsel three times in twenty-three months of representation. She said he seemed disinterested in her case.

The Petitioner testified that although she informed trial counsel that her mother was dying of cancer, he did not speak to her mother before her death. She said that her mother was present during the offense and that her mother would have provided information that contradicted the victim's account of the crime.

The Petitioner testified that the crime occurred because she and the victim were fighting over the Petitioner's boyfriend. She said that even though the victim was dating the Petitioner's brother, the victim was having an affair with the Petitioner's boyfriend. She said

that trial counsel did not subpoena the boyfriend and that counsel told her not to mention him at the trial. She said that she wanted to introduce evidence of a hotel bill and telephone bills showing the victim's involvement with her boyfriend but that counsel did not use them at the trial. The Petitioner introduced as an exhibit a cell phone bill that she said showed contact between the victim and her boyfriend. She said that her boyfriend admitted dating both women but that the victim denied involvement with him. She said trial counsel should have used the evidence of an affair to impeach the victim's credibility.

The Petitioner testified that trial counsel failed to investigate the 9-1-1 call that the victim claimed to have made. She said the victim "had her phone hooked up some kind of way where . . . if you called her, it would ring, but it would show up as a day care." She said this evidence would have impeached the victim's claim that the Petitioner pulled the phone cord from the wall because emergency personnel would have gone to the day care, rather than to the crime scene, had there been a hang-up call to 9-1-1. She said this would have shown that the victim made the call from the Petitioner's mother's phone, which was in a different room than the victim claimed she was in after the fight. She said trial counsel could have asked her mother whether the telephone cord had been ripped from the wall. She acknowledged that by the time trial counsel was appointed, the scene was not the same as it was on the day of the crime.

The Petitioner testified that she gave photographs of the scene to trial counsel. She said three of the photographs demonstrated the impossibility of the victim's claim that she stood in a doorway and saw the Petitioner retrieve a knife from the kitchen counter. She said trial counsel did not use the evidence at the trial.

The Petitioner testified that trial counsel did not discuss trial strategy with her. She acknowledged that he showed her photographs from the State. She said trial counsel told her not to talk about her boyfriend. She said that he told her to smile at the jurors and that she thought this was inappropriate because it would show that she had no remorse or enjoyed fighting.

The Petitioner testified that trial counsel wanted her to accept a plea agreement. She said, however, that he never communicated any offers to her from the State. She said that every time he mentioned a plea agreement, she interrupted him to say she did not want to accept a plea agreement because she was not guilty.

The Petitioner testified that trial counsel "barely" consulted with her during breaks in the trial and when the jury was not in the courtroom. She said that she gave him a list of questions she wanted him to ask the victim but that he said "later" and did not use them. She

7

said that with respect to some of the questions, trial counsel told her they were not going to talk about the Petitioner's boyfriend.

The Petitioner testified that she was dissatisfied with trial counsel's performance relative to pictures of the scene. She said that when she left her mother's home after the fight, the only place there was blood was on the bed where the struggle took place. She said the photographs showed blood in other locations. She said these photographs should have been used to show that the victim, not she, introduced the knife into the fight. She admitted that the victim received knife wounds during the fight. She said the photographs showed that the victim staged the scene afterwards. She said the photographs demonstrated that blood was not on the door in the locations expected if the crime occurred as the victim claimed. She said trial counsel should have requested admission of all photographs showing a bloody crime scene to demonstrate that the victim fabricated her story.

The Petitioner also testified that trial counsel failed to use a photograph of a bag of ice, a bucket of water, and blood that appeared to be mixed with water on the cradle of a telephone. She said this photograph would have contradicted the victim's testimony that she did not leave the room where the crime occurred until after the police arrived because it showed that the victim left the room to retrieve ice and water. She said trial counsel should have had the photograph examined to determine whether the blood on the telephone was mixed with water.

The Petitioner testified that she wanted trial counsel to subpoena the victim's nephew. She said his testimony could have been used to contradict the victim's claim that she rented a hotel room for him. She said this would have demonstrated the victim's lack of credibility.

The Petitioner testified that trial counsel failed to cross-examine the victim adequately. She complained that he never cross-examined the victim about her testimony that the Petitioner retrieved a knife, ran to the victim, and said, "B----, I'm going to kill you." She said the victim never made this claim in any of her pretrial statements. She said trial counsel failed to address this testimony in his closing argument. She said trial counsel also failed to cross-examine the victim about her claim that she struggled with a door knob during the altercation, even though a photograph showed underwear hanging on the doorknob. She said the underwear would not have remained on the doorknob had the victim's testimony been accurate. She said trial counsel only cross-examined the victim about some of the inconsistencies between the victim's testimony at the trial and the preliminary hearing. She noted that the victim testified at the preliminary hearing about a cut on her face but that this injury was not documented in the police report. She said trial counsel also failed to introduce the victim's medical records to show where the victim was cut.

8

The Petitioner testified that trial counsel did not adequately question her during direct examination. She said that she was not on the stand for a long time and that he did not ask questions she thought were important. She said that trial counsel never asked her whether she said, "B----, I'm going to kill you," and that the jury believed she said it even though she did not make the statement.

The Petitioner testified that trial counsel's closing argument did not mention several inaccurate statements in the victim's testimony. She specified that trial counsel did not argue against the victim's claim that the Petitioner threatened to kill her, that he did not address the State's proof that the crime occurred behind a door and not on a bed, that he did not talk about the photographs, and that he did not address the victim's claim that the Petitioner yanked the telephone cord from the wall.

The Petitioner testified that she was dissatisfied with trial counsel and that she retained appellate counsel to represent her at the sentencing hearing and on appeal. She said she had a disagreement with appellate counsel because counsel did not want to represent the Petitioner in a drug case. She said that appellate counsel was upset because the court denied her motion to withdraw in the drug case and that she thought this affected appellate counsel's representation in the present case. With respect to her dissatisfaction with appellate counsel, the Petitioner claimed that she asked appellate counsel about the status of the appeal several times and that counsel always said she "had not heard anything." She stated that appellate counsel claimed to have filed a brief but that the Petitioner was told otherwise by a court clerk. She said that when she contacted appellate counsel about the information from the clerk, appellate counsel claimed that her assistant was working on the brief.

On cross-examination, the Petitioner testified that the victim's hands were on the knife and that the victim "got stuck during the struggle." She said that although the defense theory was self-defense, trial counsel never said anything about the Petitioner's being injured during the fight. She said she had a bite mark, scrapes on her hands and arm, and patches of her microbraids pulled out. She claimed she was not afraid of the victim before the knife appeared in the fight but said she was afraid once the victim pulled the knife. She said that she was not afraid for her mother's safety when she left the house after the fight and that the victim had no dispute with the Petitioner's mother.

The Petitioner acknowledged that the hotel receipt was mentioned in the proof, but she said trial counsel was not the person who introduced it. She admitted that a police officer testified about a hang-up call to 9-1-1 placed from the scene. She said she thought the photograph to be introduced showed blood on the floor, blood on the phone, ice, and water. She said that the photographs were mixed up at trial and that with respect to this photograph, "they put them in and they put them out. . . . [W]hen they did put it back in, then they ruled

9

it out, I didn't get a chance to use this picture. . . . When it came down to me to say this picture, they ruled it back out." She said counsel could have had the victim's doctor testify and introduce the victim's medical records to show the location of the victim's injuries. She said trial counsel told her the court ruled that the medical records were not admissible because they contained the victim's admission that she smoked marijuana. She admitted that the victim showed scars to the jury that the victim claimed were from her stab injuries. She acknowledged that her mother was in the house but not in the room when the fight occurred.

The Petitioner acknowledged that appellate counsel filed a timely brief but said that appellate counsel did not review the evidence or present all of the issues. The Petitioner said she "found all this stuff that was messed up" in the brief. She said that appellate counsel stated that her assistant prepared the brief, but the Petitioner said that counsel's assistant knew nothing about her case.

Appellate counsel testified that she was licensed after the first 2006 bar examination and that the Petitioner retained her later that year for the motion for new trial and appeal. She acknowledged that her motion to substitute counsel was dated October 24, 2006. She thought she reviewed the transcripts of the preliminary hearing and the trial. She said she spoke with trial counsel a couple of times but did not meet formally with him. She said she had several meetings of at least one hour each with the Petitioner before the sentencing hearing. She said her first priority when she was retained was the sentencing hearing. She said that after the hearing, she prepared a motion for new trial and met with the Petitioner several more times. She said she discussed the issues to be raised in the motion with the Petitioner. She said that the Petitioner wanted to raise an issue of whether trial counsel provided ineffective assistance but that she advised the Petitioner this claim should be raised in a post-conviction action. She said she explained an ineffective assistance claim to the Petitioner. She said she raised all the issues she thought were proper for the motion for new trial.

Appellate counsel did not recall whether she met with the Petitioner between the denial of the motion for new trial and filing the direct appeal, but she said that the Petitioner made unscheduled visits to her office and that she spoke with the Petitioner on these occasions. She did not remember the number of occasions this happened but said it was "more than a few." She said that she had an employee who worked on the brief but that she approved his work before she signed it. She said she raised all the issues on appeal that she thought had a legal basis.

Appellate counsel testified that in the fall of 2006, her caseload involved over ninety percent criminal cases. She said that she had not done appellate work for her own clients before the Petitioner's appeal but that she "had clerked in D.C."

On cross-examination, appellate counsel testified that she argued mitigating factors at the sentencing hearing, although she did not file a notice before the hearing of the factors upon which the Petitioner would rely. She said that in addition to her many meetings with the Petitioner, she spoke with her by telephone once or twice a week. She said that after the appellate court affirmed the Petitioner's conviction, she saw the Petitioner in court without counsel and tried to help her. She said this proceeding was related to the Petitioner's failure to turn herself in to serve her jail sentence for the attempted murder.

With respect to the Petitioner's new charge for the drug offense, appellate counsel testified that the Petitioner claimed that trial counsel was representing her but that she wanted appellate counsel to do so. Appellate counsel said that she "arraigned her" but that the Petitioner thought mistakenly that appellate counsel would represent her in the drug case without additional payment. She said that the Petitioner stated she would get a public defender for the case but that when appellate counsel filed a motion to withdraw, the trial court appointed her to represent the Petitioner. She said that other than the issue of the additional fee, she had no problem with accepting the representation when the Petitioner asked her to do so.

Appellate counsel testified that she thought the result of the sentencing hearing "was pretty good." She did not recall whether she considered raising an issue in the motion for new trial regarding the sentence but said she thought the sentence was fair.

Trial counsel testified that he was appointed to represent the Petitioner in 2005. He said that he had been licensed for ten years and that his caseload involved over ninety-five percent criminal cases. He said that he litigated five or six jury trials before he was appointed to the Petitioner's case and that some of them involved Class A and B felonies.

Trial counsel testified that the trial court approved his motion for investigative fees. He said that he and the investigator met with the Petitioner several times in addition to court dates. He said the investigator also met with the Petitioner on other occasions to obtain names of possible witnesses. He said the investigator provided him with reports about the investigation.

Trial counsel testified that he met with the Petitioner more than three times. He said he met with her on court dates at least four or five times. He said he also communicated with her by telephone and at a couple of meetings. He said that if his fee claim form represented twenty-four meetings and telephone calls with the Petitioner, it was accurate. With respect to communication during the trial, counsel said there were many times when he told the Petitioner to be quiet and wait to discuss something during the break. He said that he did this

because he was trying to pay attention to the proceedings but that he communicated with her during breaks and recesses.

Trial counsel testified that the telephone records the Petitioner wanted to introduce did not provide a defense to the attempted murder charge. He said that in his professional opinion, he did not think they were a relevant part of the trial strategy. He said the information about the Petitioner's jealousy over the victim's relationship with the Petitioner's boyfriend would have furthered the State's case. He said he wanted some of the exhibits excluded. He said photographs of pools of blood were "horrific" and prejudicial to the Petitioner. He said he filed a motion to exclude the victim's medical records because he thought they supported the State's theory.

On cross-examination, trial counsel testified that he did not recall whether he and the Petitioner discussed the photographs she took. He could not recall whether she gave him the photographs and said she might have given them to the investigator. He said that if she gave them to the investigator, he would have seen them.

Trial counsel admitted he did not recall whether the Petitioner told him that her mother was terminally ill. He said the Petitioner told him during preparations for the trial that her mother was in the living room when the offense occurred in the bedroom. He denied that the Petitioner told him that her mother stuck her head in the bedroom during the fight.

Trial counsel testified that he discussed the trial strategy with the Petitioner. He said the Petitioner's brother "was going to shed some light . . . on what transpired . . . and . . . the whole jealousy motive." He did not recall any specific discussions about the 9-1-1 call or the telephone cord, but he was sure they discussed this evidence. He said they reviewed everything, including the risks and possible benefits of going to trial.

Trial counsel testified that he did not think he was overworked when he represented the Petitioner and that he thought he gave her case adequate attention. He said he relied on the investigator because doing the investigative work himself in addition to the trial preparation for serious cases "would have been . . . stretching it too thin." He said he typically submitted a petition for approval of expert services to the trial court within a week of a defendant's arraignment.

Trial counsel testified that the majority of his conversations with the Petitioner about trial preparation would be reflected on his fee claim form. He said that because the Petitioner was on bond, it was easier to talk to her.

Trial counsel testified that he did not think the Petitioner's disagreement with the victim over the Petitioner's boyfriend was relevant to the defense. He thought that proof of jealousy would further the State's case. He said he advised the Petitioner of his opinion. He stated that he probably told her not to mention her boyfriend at the trial, although he did not recall such a conversation.

Trial counsel could not recall whether the photograph of the bloody bed was admitted. He said he thought the photographs showing blood were not helpful. He said the photograph of the bed supported the Petitioner's claim that the fight took place on the bed, not behind the door, but the photograph did not negate the fact that someone had been stabbed.

Trial counsel testified that he gave the Petitioner copies of all the motions he filed. He said that he discussed with her the reasons he sought to exclude evidence and that she seemed to understand at the time. He noted that the medical records contained diagrams detailing the victim's injuries and supported the State's case.

Trial counsel testified that he reviewed a transcript of the preliminary hearing. He disagreed that there were numerous inconsistencies between the victim's testimony at the hearing and at the trial. He said there were no inconsistencies that he considered major. He could not recall whether the preliminary hearing transcript reflected that the victim testified the Petitioner said, "B----, I'm going to kill you." He said that this was an important statement for the State's case and that it would have been significant if the victim never made the claim before the trial.

With respect to his closing argument, trial counsel testified that he relied on a theory noting the credibility of the witnesses. He said he thought he mentioned all of the inconsistent statements.

On redirect-examination, trial counsel testified that the photographs the Petitioner wanted to use supported the State's theory. He could not recall whether the court excluded some of the photographs.

The Petitioner offered a recording of the preliminary hearing as evidence and asked the court to review the testimony of the victim for inconsistencies. The court filed an order in which it found that the Petitioner failed to prove her allegations by clear and convincing evidence. The trial court's order recited the testimony and made the following findings of fact and conclusions of law:

> First, the petitioner claims that counsel failed to file
> proper notices and motions and failed to protect the petitioner's

13

Constitutional rights on appeal. The Court does not agree with this finding. Both trial counsel and appellate counsel filed proper motions and the petitioner's case was appealed all the way to the State Supreme Court; however, the Court declined to hear her case.

Next, the petitioner claims that counsel failed to properly investigate the petitioner's case. The Court finds no merit in this argument either. [Trial counsel] hired a private investigator per [Tennessee Supreme Court] Rule 13, and had a legitimate trial strategy and developed it as best as possible. Therefore, the Court will deny this argument.

Next, the petitioner claims that counsel failed to adequately meet with the petitioner throughout the trial and appeals process. Again, this argument is without merit. [Trial counsel] supplied documentation showing that he met with the petitioner on nineteen (19) separate occasions and discussed all of the issues of the case with the petitioner. The argument is therefore denied.

Next, petitioner argues that trial counsel failed to adequately advise her on defense strategies. This argument is without merit as well. The petitioner herself testified that [trial counsel] advised her on certain topics to discuss while on the stand and other topics to stay away from. Tactical decisions made by counsel ordinarily are not grounds for Post-Conviction Relief, if reasonable. There were tactical reasons to make the decisions trial counsel made. Therefore, this issue is without merit.

Next, petitioner argues that trial counsel failed to properly investigate witnesses. Again, this issue is without merit. Trial counsel utilized the services of a private investigator. Therefore, this issue is without merit.

Next, the petitioner argues counsel failed to properly object during cross-examination of a witness or when photographs were excluded that would have strengthened the petitioner's case. Some of the petitioner's testimony was

confusing in that she wanted certain photos introduced that counsel tried to keep out; regardless, the jury saw photos relevant to present all evidence for both sides. These issues, and the remainder of the petitioner's claims, are trial strategy and therefore without merit.

The Court finds that the petitioner's issues are without merit and that the petitioner failed to meet her burden by clear and convincing evidence. Therefore, the petition for post-conviction relief is hereby denied.

On appeal, the Petitioner argues that the trial court erred in denying relief. The State argues that the trial court's ruling was proper. We hold that the Petitioner has not shown that she is entitled to relief.

The burden in a post-conviction proceeding is on the Petitioner to prove her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. at 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. In the context of a guilty plea, in order to prove prejudice, a petitioner "'must show that there is a reasonable probability that, but for counsel's error,

15

he would not have pleaded guilty and would have insisted on going to trial.'" House v. State, 44 S.W.3d 508, 516 (Tenn. 2001) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

Our supreme court has held that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See id. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

The Petitioner raises several challenges to the trial court's ruling in her brief. All of the Petitioner's contentions are based upon the trial court's accreditation of the proof presented at the hearing. As noted above, we are bound by the trial court's factual findings unless the evidence preponderates against them. Fields, 40 S.W.3d at 456-57.

The Petitioner contends that trial counsel was deficient for failing to speak with her mother before her mother's death. She claims her mother was a crucial defense witness. Trial counsel did not recall whether he spoke with the Petitioner's mother, but he testified that the Petitioner told him before the trial that her mother was in the living room and did not see what occurred between the Petitioner and the victim. He denied that the Petitioner told him her mother saw part of the altercation. At the post-conviction hearing, the Petitioner was adamant that she wanted evidence presented to show that the struggle took place on the bed, that the victim left the bedroom before the police arrived, and that the victim staged the scene to fit her version of events. The record reflects, however, that trial counsel knew the Petitioner's wishes that the evidence to dispute the victim's account of the crime be presented. He advised her that in his professional opinion, offering evidence of this nature would further the State's case. The trial court found that trial counsel made decisions based upon trial strategy and that trial counsel made reasonable tactical decisions. The record supports the trial court's rejection of this portion of the Petitioner's ineffective assistance claim.

16

Similarly, the Petitioner argues that trial counsel was ineffective for seeking exclusion of photographs that supported the Petitioner's version of events. Trial counsel testified that he thought the photographs of a bloody scene were "horrific" and prejudicial to the defense. He also said the photographs did nothing to disprove the fact that a stabbing occurred. We note that this court's opinion on direct appeal reflects the Petitioner challenged the trial court's admission of a photograph showing blood in the room where the attack occurred to impeach a defense witness. Marilyn Denise Avinger, slip op. at 4-6. This establishes that despite the Petitioner's post-conviction claim that trial counsel was ineffective for seeking to have this evidence excluded, the jury saw a photograph depicting the blood in the bedroom. The trial court found that the Petitioner's testimony was confusing relative to this claim and that in any event, the jury considered photographs that were relevant to present all of the evidence for both the State and the defense. The Petitioner did not establish that counsel failed to use photographs that would have furthered the defense. She is not entitled to relief.

The Petitioner contends that trial counsel failed to impeach the victim's testimony adequately with her previous statements. She refers to trial counsel's failure to point out that the victim never claimed before the trial that the Petitioner swore at her and threatened to kill her. Trial counsel did not recall whether the first time the victim made the claim was at the trial, but he said he used the victim's previous statements for impeachment, and he thought he did an adequate job.

The Petitioner has not identified the precise testimony from the preliminary hearing upon which she relies. Our review of the recording in the record includes the victim's account of the Petitioner's statements: The Petitioner asked the victim whether the victim was afraid to face her and "said something else," the Petitioner hit the victim, and they began fighting. The Petitioner went to the kitchen to get a knife and returned and stabbed her. On cross-examination, the victim said "[the Petitioner] made a statement to [her]," and then hit her. Defense counsel later asked, "So she wasn't trying to kill you?" and the victim replied, "Oh yes, she was." On redirect examination, the victim testified that after the Petitioner stabbed her, the Petitioner said to her mother, "I know the b---- is going to swear a warrant on me. I'm going to turn around and swear a warrant on her." She said the Petitioner also told her mother to "get some bond money to get her out and to remember [the Petitioner] had a knife."

Although the victim did not specifically testify at the preliminary hearing that the Petitioner swore at her and said she was going to kill her, the victim said that the Petitioner made an unspecified statement to her before beginning the fight. The victim was not asked at the preliminary hearing what that statement was. When cross-examined about whether the Petitioner was going to kill her, she said, "Oh yes, she was." Although this evidence might

have impeached the victim for failing to reveal the nature of the Petitioner's statement at the preliminary hearing, it would not have shown that the victim never claimed the Petitioner said something other than what the victim claimed at trial or that the Petitioner said nothing. In any event, trial counsel testified that he impeached the victim's credibility and argued witness credibility in his closing argument. The Petitioner failed to demonstrate that additional cross-examination would have added any benefit to the efforts counsel made to challenge the victim's credibility.

Regarding the performance of appellate counsel at the sentencing hearing, the Petitioner argues that appellate counsel did not meet with the Petitioner enough before the sentencing hearing, did not file a notice of any mitigating factors before the sentencing hearing, did not meet with the Petitioner's trial counsel before the hearing, and did not raise an issue based upon the trial court's failure to consider the mitigating and enhancement factors. The record reflects that appellate counsel met with the Petitioner numerous times and spoke with her by telephone before the sentencing hearing. The Petitioner acknowledges in her brief that counsel had "several" meetings of "about an hour" with her before the sentencing hearing. Appellate counsel said she spoke to trial counsel by telephone before the sentencing hearing. She testified that she argued the mitigating factors that should apply at the sentencing hearing. Appellate counsel testified that she raised all issues that she thought had a legal basis in the motion for new trial and on appeal. The trial court found that appellate counsel's performance was not below the acceptable standard. The proof supports the trial court's finding that the Petitioner failed to establish her claim.

The Petitioner argues that the cumulative effect of "numerous significant errors and omissions" in the pretrial, trial, and appellate process by both trial counsel and appellate counsel deprived her of the right to the effective assistance of counsel. The trial court did not make any findings that deficient performance occurred, and the Petitioner has not demonstrated any error in the trial court's determination that trial counsel and appellate counsel's performance were not ineffective. There are no errors to accumulate.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

18